21-5662 Standard Insurance Company v. Joel Guy Jr. et al. Oral argument not to exceed 15 minutes per side. Mr. Roper for the Defendant Appellant. Good morning. Good morning, and may it please the Court. Aaron Roper for Appellant Joel Guy. Before you begin, I do want to thank you for accepting the assignment of this case. I saw that the Clerk's Office requested attorneys to take the case, and I want to thank you very much for your service to the Court by taking the case. And I'm sure your client is appreciative, too, so thank you. Thank you. We thank the Court for the appointment. I'd like to reserve three minutes for a vote. Very well. In Section 1104 of ERISA, Congress enacted a simple, bright-lined rule to govern who receives ERISA benefits. Follow the written, planned documents. Here, everyone agrees that those documents direct benefits to Mr. Guy. The District Court's decision instead awarding benefits to appellees should be reversed. Can I jump right in?  So, in this circuit at least, follow the plan can't be a bright-lined rule. I mean, follow the plan is inconsistent with Tinsley. So, can you explain to me why follow the plan is a bright-lined rule in your case? Yes. I actually think the Tinsley case is extremely helpful for us, because I do think that is a follow-the-plan case. In the footnote of that case, it clearly distinguishes between the context of whether the planned documents are valid and whether we are following the planned documents. Because ERISA says we have to follow the plan, but it doesn't say, how do we figure out if this piece of paper is the plan? And I think that's a critical distinction. Because on whether something is part of the plan, ERISA doesn't have guidance, so you do look to federal common law there. Right, but that would only be true if we thought that, I mean, I can understand the case of forgery, but the case of undue influence is a little trickier for you, right? So, in the case of undue influence, what we're saying is, ah, yes, this person did write the name John Smith on the line, unlike the case of forgery, but John Smith, you know, was too close to the benefactor and exerted some undue influence, so they didn't really mean, had they known that they were trying to trick this person, they would not have written the name. So that's a different case and much closer to a Slayer case, right? Because surely Mrs. Guy, had she known that her son was going to murder her, would not have written his name on the line. I respectfully disagree. I think Kinsley is framing the undue influence issue as a question of contract formation. If someone was sort of duped into signing the document, it's not a planned document at all. It never became part of the plan. It is not a valid document. Kinsley very clearly distinguishes between validity questions and whether we are going to follow the plan. And here, we can hypothesize what the decedent's intent would have been, but there's no question that this is a validly executed planned document. It names my client. It is unambiguous. And so in this circuit. Right, but that's also the case in undue influence. In an undue influence case, it unambiguously names John Doe as the beneficiary. The reason that we think that that's not valid is because we think that the person executing the plan, I'm just going to call the benefactor, would not have done so had they known all the right circumstances, that they were being swindled. I don't think Kinsley frames this as an intent question. I think it frames this as a validity question or a formation question. However it frames the question, is it distinguishable from this case? I mean, why isn't that actually the right framing of the question? No, I don't think that's right because the question is really, from the plan administrator's perspective, do we follow this planned document? And, of course, you have to figure out what the planned documents are. And that's going to be a question in every case. I have this piece of paper here. It says to pay someone, but is this actually part of the plan? That's something that we have to figure out, and that's something you can use federal common law on. But once it is undisputed that this is part of the plan, I don't know how you distinguish this from other contexts like divorce, where obviously someone doesn't want this money going to their long-ago ex-spouse that they just left on the form and forgot to change. Well, but you don't have a long common law history there. So, I mean, I'm actually wondering whether the right answer to this question might not be one that the Solicitor General, to the Slayer question, might be one that the SG proposed in its briefing in Kennedy, which is not a resort to common law per se, but rather interpreting the word beneficiary in light of the common law. And Kennedy itself tells us to do that, right? Yes, so two responses there. First, it's actually not true that the divorce revocation issue isn't well-rooted. That actually rule goes back to the English common law. It's extremely common in all 50 states, and yet the Supreme Court's opinion in Kennedy mentions none of that because it's categorically irrelevant under the plan. Our research indicates something different, but okay. That's fine. But, no, I do think once you have the plan here and no one is suggesting that the plan is ambiguous on who is receiving the benefits, I mean, it doesn't just say we pay the beneficiary. It says we pay the beneficiary you name. There's a piece of paper here that has Mr. Guy's name on it. Also true in Tinsley. Also true in Tinsley. But there there's a question of whether it was a valid part of the plan. And here there's no question that this is a validly executed plan document. Well, I mean, that's true if you think that ERISA did not take the old soil, I think is the word they used in Kennedy, or was not drafted with an eye to the old law. And Kennedy tells us that ERISA takes the meaning of its terms from the common law. There is no common law principle more ancient than this one, the Slayer Rule. And so why don't we think that the word beneficiary itself incorporates that? Are you referring to beneficiary in Section 1002 or beneficiary in the plan documents? Well, both. So in Section, I guess it is 1002, beneficiary means a person designated by the participant or the terms of the plan who may become entitled. But I don't know why we don't read the word beneficiary in light of the common law. I think to sort of be reading in those background principles, you need some gap or ambiguity in the text for those principles to be filling in. I think the Supreme Court's decision in U.S. Airways v. McCutcheon is really instructive on that score. But Tinsley itself says that there is a gap. Tinsley itself says ERISA does not answer this question. Your answer is ERISA does answer the question. The question is pay the person whose name is written on the line. The person's name was written on the line in Tinsley. Our court said it doesn't answer the question. So your answer can't be the right answer. So why is this case different? This case is different because ERISA doesn't say pay the person whose name is on the form. It says pay the money in accordance with the plan documents. So there is that antecedent question of is this form a plan document. I can keep repeating that, but I think that is the really critical distinction in Tinsley. But it doesn't matter. So I understand your distinction. But Tinsley did not, the plan itself did not say, did not account for cases of forgery, fraud, undue influence. Right, so that's not the argument. Your argument is just it's about document formation and Slayer is different. Correct. This is a question of we have this document, it's clear, and the question is whether we're going to override that based on some external source of law. Obviously, Brightline rules have costs. Everyone knows that many of these outcomes can be unfair in individual cases. Many of the divorce cases are incredibly unfair. And yet this court and the Supreme Court have repeatedly rejected federal common law in that area because the plan terms control and ERISA's text is clear. And in the aggregate, Brightline rules further ERISA's central focus on simple, uniform plan administration based on the terms of the plan. Plan administrators are easily- Can I ask you a question about that? I just let my colleagues ask questions, too. But let me get this one in. I get your argument about ERISA preemption. It's incredibly broad. I understand the point about making it easy on plan administrators. How far do you think ERISA preemption goes? So, in other words, does ERISA simply preempt state law to the extent that state law would be trying to issue directions to the plan administrator? So, in other words, Tennessee cannot tell a plan administrator who to pay. However, do you think that ERISA preempts the state substantive law of property? So, in other words, if the Slayer Statute itself worked a revocation of the property interest, would ERISA preempt that? Insofar as the state law would require the plan administrator not to pay the person named in the plan, yes. ERISA preempts state property laws. That's bogged state community property laws.  But if ERISA has to pay the person on the line, and then by operation of state law, that property interest disappears, ERISA doesn't say anything about that. So, in other words, a constructive trust could be imposed. Those funds could be lost in a wrongful death action. It could be that Tennessee law works a revocation itself, the instant of death. All of that would be fine. Yes, so long as the plan administrator is able to follow the plan and pay out the money, at that point, state law can impose whatever remedy it wants. I think that just underscores why the policy concerns are overstated here. State law is free to impose other wrongful death actions, what have you. And here, these funds are all in the hands of the court, and there's still a common law action. There is still a pending wrongful death claim, correct. And we do not think that is preempted. Mr. Roper, in Engelhoff, the Slayer statutes were really front and center in the briefing and in the oral argument. I read the oral arguments in Engelhoff, and it took a lot of the arguments. And the Supreme Court addresses the Slayer statutes at the end of the opinion. And I know you characterize that as dicta. And there's a question of whether our court has to follow the dicta of the Supreme Court. But I can tell you that if we don't, we do so at our peril of not following the dicta. So I look at Engelhoff as Justice Breyer and Stevens would hold that the Slayer statutes are not preempted. And then the other seven justices in Justice Thomas's opinion in the dicta certainly imply that the Slayer statutes are not preempted. Plus, we have the Seventh Circuit case, which if we rule in your favor, we would create a circuit split, which, just so you know, I'm very reluctant to create circuit splits because it creates havoc throughout the country. Tell me why we shouldn't follow the dicta. I know you throw it away as dicta, but recognizing that we normally do follow dicta, tell me why we shouldn't follow the dicta here. On its own terms, Engelhoff expressly says it's not deciding this question. It's the Supreme Court reaffirming Kennedy. But the only reason that Engelhoff even thought this question was debatable was on the premise that state Slayer rules are more or less uniform nationwide. Well, you're saying they're wrong. And whenever we tell the Supreme Court they're wrong, it's not a good thing to do, by the way. They don't like that. And whether they are correct or not, they have the final word. And I think Justice Thomas says that they are more or less uniform nationwide. And you make good points. You made the same points Justice Breyer did in his dissent, that there's a lot of differences in the Slayer statutes. But I think all 50 states have one. And I think that was the only point Thomas was making, is that this is a matter that it's uniform throughout the 50 states. Also, these Slayer statutes preexisted 1974 when Congress passed ERISA. And for express preemption, you normally look at congressional intent. And I think Thomas was saying, well, it's pretty hard to say that Congress intended for at least this one unique area, this one exception to the general rule to preempt all the state Slayer statutes. And, I mean, tell me why I'm wrong there, the way I read the dicta. Yes, of course. To start, I think if you're concerned about the dicta in Egelhoff, the easiest way to resolve the preemption question is conflict preemption, which Egelhoff doesn't address. We have a direct conflict here. ERISA and the plan documents say to pay Mr. Guy Tennessee's loss. The documents, they don't say specifically, and if you kill your parents, you're still entitled to benefits, that Slayers are still entitled to benefits. It's a more general statement that the beneficiaries get the benefits. It doesn't address this. I say it's an exclusion, that the ERISA insurance plan has, this is generally who gets the benefits. What is it? Is this Tennessee? Anyway, the state here has an exclusion. Normally in conflict preemptions, it's that the state statute and the federal statute cannot coexist at all under all circumstances, right? And here, if you view the state statute as an exclusion to the general rule, they still can coexist, couldn't they? No, they could not. Justice Breyer made that exact argument in his dissent in Egelhoff, and the Supreme Court rejected it in footnote one of that opinion. You can't just treat this as a level of generality problem. When Congress speaks in broad but absolutely unequivocal language, that doesn't let states carve out exceptions to those rules on policy grounds. Justice Breyer would enforce the Slayers statute, would he not? Justice Breyer was emphasizing the disuniformity point, which under Egelhoff, the majority's reasoning held. Yeah, I mean, he's disagreeing with their reasoning, but he would have held. But on the actual divorce context of Egelhoff, Justice Breyer was making the same level of generality argument that ERISA doesn't address the revocation on divorce. There's this narrower exclusion in the state context about divorce, and so ERISA's follow the plan mandate doesn't preempt that. The majority in the divorce context clearly rejected that. We think the exact same logic of Egelhoff, whatever you do with that paragraph at the end of the opinion compels preemption here. Also, I'd note that Egelhoff also talks about the central matter of plan administration preemption and says that ERISA preempts state laws that govern the payment of benefits. I don't know how you would characterize Tennessee's law as anything other than governing the payment of ERISA benefits, so I think under the holding of Egelhoff, we have clear preemption here. Of course, I know he's out of time. If the idea that I floated with you, which I know you reject, that the term beneficiary includes a slayer rule, then there might still be ERISA preemption, but there would not be conflict preemption, correct? If ERISA already incorporated a slayer rule. A slayer rule, which would be a federal slayer rule. Of course, we're in the court case here, right? So we don't have to worry about edge cases. We have a first degree premeditated murder jury trial, all appeals final. All appeals are not final. The direct appeal is still pending in the Tennessee Supreme Court. My law clerk tells me otherwise. I thought it was going to be wrong. That's a knowable fact. Okay. Wait, but can I get an answer? Do you agree with me that if the term, I know you do not agree that the term beneficiary incorporates a slayer rule. But if it did, then there would be no conflict preemption. I mean, at that point, if there's already a federal common law slayer rule, I think we're pretty agnostic because we've already lost the case at that point. If you've ruled against us on that. I'm not saying there's a federal common law slayer rule that we can just say ERISA doesn't answer this question and we can resort to the common law. What I'm saying is the term beneficiary in the statute incorporates a slayer rule, and so it's already baked into the statute. But whatever, obviously state laws vary tremendously on their slayer rules on all sorts of dimensions, and so I think whatever that federal rule would be would preempt any conflicting state law. Yep, got it. Do you have questions at this time? I have some questions, but I think I will reserve them for your rebuttal. Okay, you have your three minutes for rebuttal. You can use it now. No, we'll save it for rebuttal. Or you can save it. All right, I know we must have other things to say because we've spent all your time with questions, but that's actually a good thing. Thank you very much. All right. Let's hear from the Appellate Lead. Good morning, Your Honor. May it please the Court. James Friel for the Appellate Leads, Michelle Dennison, Angela Crane. Apologize to the Court that this is not one of the cases that came before it this morning. It's not quite as lighthearted. Two issues before the Court, obviously, are the issue as to whether the Tenancy Slayer Statute is preempted, and if not, does federal common law bar recovery? We believe this is a very simple case. It obviously is a case of first impression before the Court. As the Court correctly pointed out, the Seventh Circuit, which has addressed the issue, has held in the same manner as did the District Court in this case. No preemption.  No preemption. Then the District Court got it right when they said that it didn't matter whether Tenancy Slayer Statute applied or there was federal common law, the result is the same. And this Court should find exactly that as well. The issue, first and foremost, is, and Judge Larson, I believe you pointed out, I apologize, I'm diabetic so I'm a little shaky from not eating this morning, but in any event, so first, these Slayer Statutes have been around since time immemorial. And there's a reason for it. This was a brutal case where the son murdered both of his parents. We know the facts. You don't really have to go through them. My point being, Your Honor, is that is why these Slayer Statutes exist. For this exact situation. Correct. You are in the core case. We understand. But the question is whether or not this federal law, which has the broadest preemption, is what the Supreme Court tells us, nonetheless deprives Tenancy of its right to have this Slayer Rule. Right, and what I would say to that, Your Honor, is that ERISA does not preempt in this case. The other side would argue that the issue is not addressed in ERISA. I would argue that that is not true. It is. Actually, I think he would say it is addressed. Right, I'm sorry. The issue is addressed, pay the person whose name is on the line. Follow the plan. And as Judge Larson, as you point out. I assume there's nothing around the time of the passage of ERISA that has anything to do with this issue that Congress was thinking about in Slayer Statutes. I was unable to find any, Your Honor. And I assume there's nothing at the founding of this country when Congress was given powers to legislate talking about whether it was given a power to pass a law that would allow a murderer to benefit from a murder. No, in fact it would be quite the opposite, Your Honor. The core of public policy is we don't reward murderers for committing murder. So, certainly not. And as the court pointed out, there's not a bright line rule. We do have to look to the facts of the case. And if anything, and I thought this was a bit of a unique argument. I didn't necessarily find it in the case law, but in looking at the actual language of ERISA, if you look at subsection 1144B4, it says that subsection A shall not apply to any generally applicable criminal law of a state. And I believe this is a bit of a unique argument. But what I would argue is that B4 actually implicates Tennessee's Slayer Statute because it says it shall not apply to any generally applicable, which obviously is very broad, criminal law of a state. Now, the Slayer Statute is not a criminal law in and of itself. ERISA doesn't define what a criminal law is specifically. It doesn't specifically state a criminal statute. But because the Slayer Statute is necessarily going to be in play in a case where the beneficiary is the murderer, that is going to implicate criminal law, the criminal statute. So I would argue additionally, in addition to the arguments that the Slayer Statute is so firmly rooted in the common law of this country, it's going to apply anyway, that ERISA, to the extent it does address whether these Slayer Statutes come into play, section B4 is going to apply, and therefore the Tennessee Slayer Statute is going to apply. Can I ask you some very practical questions about Tennessee law? So let's say that we think that ERISA requires the plan administrator to pay Mr. Guy. So in other words, she must write the check to Mr. Guy. What happens now? So this is an interpleader action. The court holds all the funds. You have a pending wrongful death action. You might have some other actions. There might be a constructive trust imposed on the funds. Do you think that, I mean, what happens after Mr. Guy is paid? So, for example, we have case law in this circuit saying that under Michigan law, a constructive trust could be imposed once the benefits are paid out, and that would be within the discretion of the district court. In other words, does it matter what the rule is of ERISA preemption if ERISA doesn't preempt state property law, state actions to go after the funds? It's not like ERISA creates a perpetual entitlement to these funds that can never be dislodged from it. Okay, I think I understand the court's question. One, just to clarify, with the interpleader action in the district court, the funds were paid into the court, and then once summary judgment was ordered into your appellate lease, those funds have been dispersed. Oh, really? Before the appeal? Yes. Okay, so the beneficiaries have gotten their money. Correct. And they'd have to pay them back if we reverse? That would be my understanding, and that would be another reason why we believe that, of many reasons that the court should affirm the district court, is I guess they would have to discord the funds and pay to the appellate. Would he have to file a separate action in order to do that? I don't know. I don't know the answer to that question. I don't either. Okay, that's interesting. So that's yet another wrinkle, but in any event, we... So you don't think you have any state court remedy? If we hold that the plan has to disperse the funds to Mr. Guy, you don't think you have any remedy at that point under state law that you could go after the funds under the property rules of Tennessee? I'm not aware of one, but just for the court's clarification, I don't represent in any underlying action, it's only this one. I've not specifically researched that issue because it has not come up. I mean, there is a pending wrongful death action. Yeah, you'd certainly have the wrongful death action. It was oddly pleaded in the alternative to this action. I mean, that seems odd. The facts of this case are quite grim. Right. I don't know why it's pleaded in the alternative, but that wasn't your doing? No, this was filed before. Yeah, that was filed separately. Okay, so there's pending wrongful death action, but you don't know. For example, in some of these post-Egelhoff divorce actions, states have imposed a constructive trust on the funds. So I'm just wondering whether by operation of state law, I mean, the state law here does say that any individual who feloniously and intentionally kills the decedent forfeits all benefits with respect to the decedent's state, etc., and there's another provision similar for a disposition of property made pursuant to an insurance plan. So it just seems to me that perhaps by operation of law, state property law, Mr. Guy no longer has an interest in these funds the same way that Mrs. Kennedy in the Kennedy case disclaimed her entitlement and the Supreme Court said, yeah, you know, maybe the state can go after Mrs. Kennedy for that money. But you don't have a position on that? No, I do not, Your Honor, not on that specifically, and I'm not involved in the wrongful death claim, so that I don't know about. But again, the Slayer Statute is the appropriate vehicle to have disclaimed benefits, and even if it wasn't, then the federal common law is going to fill that gap. That is our argument that the court should affirm. Mr. Roper, we've got three minutes for rebuttal. Thank you very much. Three points on alternative remedies, Tinsley, and the common law rule circa 1974. First, plan administrators have many alternative ways to deal with this and a huge incentive to address this in the terms of the plan. We know from the Department of Labor ERISA Advisory Committee report that we cite at page 55 of our brief that many plans, in fact, already include a Slayer term. Plans can pick whichever version is simplest and most admissible for them and follow that consistent with ERISA's follow the plan mandate. Appellee's rule would wreak havoc on those plans. If state or federal common law can override plan terms in this area, I think their position would have to be that if you had a conflict between a planned Slayer rule and a federal common law or state Slayer rule, the federal common law or state rule would govern. It would mean that plan administrators could do their job, specifically think about this issue, include a term, and still not be able to comply with their fiduciary duty to follow the plan documents. These are large, sophisticated insurance companies. Their entire job is to plan for the unexpected. The plan here includes exclusions for suicide, participation in a felony, participation in a riot, illegal drug use, alcohol use. The plan administrator could have easily included a Slayer rule here as well as many other plan administrators do. Instead, the plan administrator made a rational choice to omit a Slayer term and leaving it to a host of other... I think there's an action against the insurance company for issuing a policy that encouraged the murder of the plan participant or the employer. I don't know what the cause of action would be under ERISA's law. I'm just asking. You're a smart person. No, this court has very much toed the line in rejecting additional causative action under ERISA. You could perhaps hypothesize a breach of fiduciary duty claim by subsequent beneficiaries if there was some argument that they breached their fiduciary duty there. That, to me, seems outside that sort of ordinary conception of what a plan administrator's duty is because it actually is a very rational choice to omit this term given all of the other state law remedies we've been talking about. That are preempted? No, like wrongful death actions, which are not preempted, like criminal restitution, like forfeiture. Your Honor mentioned constructive trusts. None of those are preempted. So those all work well in the back end without interfering with ERISA's follow-the-plan mandate. I want to ask you about the question about congressional power to enact this kind of a statute that allows a murderer to benefit from a murder. Are you basing it on the interstate commerce power? Yes, that is the basis for ERISA. So could Congress pass a law pursuant to its interstate commerce power saying that all murder laws in the country are preempted if they involve interstate commerce? That might be stretching the commerce power. As I'm sure Your Honor knows, Justice Thomas has raised questions about the constitutionality of ERISA preemption doctrine in his concurrence in Gobile. But the majority of the Supreme Court has continued to adhere to the idea that ERISA's sweeping preemption clause, which everyone acknowledges, is extremely broad. As appellees say in their brief, it's extremely broad, and it is constitutional under the commerce power. Mr. Roper, we've spent most of your time with questioning, but I'll let you summarize your argument for a minute or so, if you want. Thank you, Judge Griffin. I appreciate that. To go back to the questions that Judge Larson has raised about potentially resolving this under Tinsley or reading in a SLAO rule into ERISA's term beneficiary, I don't think there is a textual hook in ERISA's text for that basis. The core of ERISA's follow-the-plan mandate that resolves this case is not the definition of beneficiary, but Section 1102's mandate that the plans include how to pay benefits in the plan documents, and then Section 1104's mandate that plan administrators follow the plan. There is no room in that text for exceptions. Congress rationally prioritized simple, bright-line rules over case-by-case equitable adjudications. Whatever the anomalies in individual cases, those bright-line rules ensure simple, uniform plan administration consistent with Congress's goals, leaving it to plan administrators to set any exclusions in the plan terms and states to offer alternative remedies on the back end after the money has been distributed in compliance with ERISA. We'd ask you to reverse. Thank you. Thank you very much for your argument, and thank you again for taking the case.